IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BANK OF AMERICA, N.A., | CIV. NO. 20-00310 JMS-WRP |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION TO |
| vs. | DISMISS COMPLAINT, ECF NO. 26 |
| COUNTY OF MAUI, | |
| Defendant. | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT, ECF NO. 26

## I.  INTRODUCTION

On July 10, 2020, the Maui County Council (the "Council") passed a resolution authorizing employment of special counsel to represent it in potential future litigation against the Bank of America (the "Bank") and other mortgage lenders related to the lenders' alleged failure to fulfill loan commitments, fraudulent foreclosures, and other "bad acts."  ECF No. 26-2.  Within hours of the Council passing that Resolution, the Bank filed this action seeking relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  The Bank seeks a declaration that Maui County (the "County") "has no claims" against it related to a pledge that the Bank made in 1994 to provide $150 million in loans for native Hawaiian housing

on Hawaiian Home Lands.  ECF No. 1 at PageID # 2.  The County now moves to dismiss.  ECF No. 26.

The Bank's declaratory action is based entirely on its own conjecture about claims that the County might eventually bring.  That is, the Bank admits that it does not know what specific claims would be alleged if the County brings suit.  Such speculation does not present a case or controversy that is justiciable under Article III of the Constitution or the Declaratory Judgment Act.  And, even if it did, the court would exercise its discretion to decline to issue a declaratory judgment.  The County's Motion to Dismiss is GRANTED with prejudice.

## II.  <u>BACKGROUND</u>

In October 2019, the Maui County Council enacted Resolution 19-171 (the "2019 Resolution") authorizing "the employment of special counsel . . . to investigate actionable claims for wrongful foreclosure and other bad acts or failures to act committed by the banking and mortgage industry," which had detrimentally impacted Maui's economy.  ECF No. 33-7 at PageID # 394.  The Resolution's preamble specifically references "the Bank of America's failure to fulfill loan commitments to native Hawaiians, Filipinos, and others."  *Id.* at PageID # 393.  Pursuant to the Resolution, the Council hired special counsel and appropriated $25,000 for a 30-day investigation.  *Id.* at PageID # 394; ECF No. 1 at PageID # 26.  At the end of this period, special counsel submitted a confidential

2

report to the Council's Governance, Ethics, and Transparency Committee with an analysis of the County's actionable claims.  ECF No. 26-1 at PageID # 260.  On the basis of the report, the Committee recommended that the Council pass a resolution to pursue potential claims further.  *Id.*

On July 10, 2020, the Council adopted this recommendation and enacted Resolution 20-97 (the "2020 Resolution") authorizing "the employment of special counsel to represent the County in the initiation and pursuit of legal claims against Bank of America and other mortgage lenders [for] failure to fulfill loan commitments, fraudulent foreclosures, and similar unlawful conduct."  ECF No. 26-2 at PageID # 287.  The preamble to the 2020 Resolution specifically references "potential legal claims against Bank of America and other mortgage lenders for failure to fulfill loan commitments to native Hawaiians, Filipinos, and others," but does not name any specific loan commitment(s) as the focus of possible litigation.  *Id.* at PageID # 286.  The 2020 Resolution also does not require special counsel to file a lawsuit, nor does the Resolution reference any specific claims that the County might ultimately bring against the Bank of America or any other lender.

"Within hours" of the Council passing the 2020 Resolution, the Bank filed a Complaint pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.  ECF No. 26-1 at PageID # 261.  The Bank seeks a declaration that the County "has no claims" based upon the Bank's 1994 pledge to loan $150 million to native

3

Hawaiians for housing on Hawaiian Home Lands.  ECF No. 1 at PageID # 3.  The

Bank believes that the County will bring claims related to this specific loan

commitment (1) because two native Hawaiian community groups have asserted for

decades that the Bank never fulfilled the 1994 pledge; and (2) because, in 2018, the

County passed a resolution voicing its support for the State of Hawaii's efforts to

investigate the Bank's compliance with this pledge (the "2018 Resolution," ECF

No. 33-9).  ECF No. 1 at PageID ## 4-5, 22.  Against this backdrop, the Bank

argues that the 2019 and 2020 Resolutions constitute a "steady march toward

litigation" related to the 1994 pledge.  ECF No. 33 at PageID # 322.

     The Bank seeks declaratory judgment "for five independent reasons:

(i) there was no contract between [the Bank] and the County; (ii) the County has no

standing to assert claims based on the pledge; (iii) the County's claims are barred

by the statute of limitations; (iv) the County's delay in bringing lawsuit constitutes

laches; and (v) the County's claims are preempted by federal law."  ECF No. 1 at

PageID # 5.

     On September 18, 2020, the County filed a Motion to Dismiss arguing

that the Bank has failed to present a justiciable case or controversy and, in the

alternative, that the court should exercise its discretion under the Declaratory

Judgment Act to decline to entertain this action.  ECF No. 26-1 at PageID ## 258-

59.  The Bank filed its Opposition on November 23, 2020, ECF No. 33, and the

County filed its Reply on November 30, ECF No. 35.  A hearing was held via video on December 14, 2020.  After hearing oral arguments, the court GRANTED the County's Motion to Dismiss.  *See* ECF No. 38.  This written order fully sets out the court's basis for that decision.

### III.  <u>STANDARDS OF REVIEW</u>

Under Article III § 2 of the United States Constitution, this court's subject matter jurisdiction is limited to deciding "cases" or "controversies."  *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.* 572 U.S. 118 (2014).  No case or controversy exists if a plaintiff lacks standing or if a case is not ripe for adjudication, *see, e.g.*, *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc), and consequently a federal court lacks subject matter jurisdiction.  *See, e.g.*, *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (reiterating that "standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III"); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction under the case or controversy clause of rticle III of the federal Constitution.").

Thus, a motion to dismiss for lack of a justiciable case or controversy is a motion under Federal Rule of Civil Procedure 12(b)(1) for lack of subject

matter jurisdiction. "A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, the County raises a facial attack by asserting "that the [Complaint's] allegations . . . are insufficient on their face to invoke federal jurisdiction." *Id.* The court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient to invoke the court's jurisdiction. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). The court will dismiss a party's claim for lack of subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation and quotations omitted); *see* Fed. R. Civ. P. 12(b)(1).

## IV. <u>ANALYSIS</u>

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."[1] 28 U.S.C. § 2201. Analysis under the Declaratory Judgment Act

---

[1] The Declaratory Judgment Act "does not by itself confer federal subject-matter jurisdiction," meaning that a plaintiff seeking declaratory judgment "must plead an independent

(cont'd)

proceeds in two steps. *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143-44 (9th Cir. 2008). First, the court must satisfy itself that the complaint presents a "case of actual controversy," that is justiciable under Article III of the Constitution. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *see also Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). Second, if there is a case or controversy within its jurisdiction, the court must decide whether to entertain the action. *Kearns*, 15 F.3d at 144 (explaining that "[t]he statute gives discretion to courts in deciding whether to entertain declaratory judgments; it states that the court '*may* declare the rights . . . of any interested party'") (quoting 28 U.S.C. § 2201); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995).

Here, able only to speculate about hypothetical future litigation, the Bank has failed to demonstrate a justiciable case or controversy. And, even if the case was justiciable, the court would nevertheless decline to issue a declaratory judgment as a matter of fairness and judicial economy.

## A.   Article III Case or Controversy

The phrase "case of actual controversy" in the Declaratory Judgment Act "refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc.*, 549 U.S. at 127. To satisfy Article III, a plaintiff

---

basis for federal jurisdiction." Here, the Bank has properly asserted diversity jurisdiction under 28 U.S.C. § 1332.

must demonstrate standing, including "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 2020 WL 7408998, at *2 (Dec. 18, 2020) (quoting *Carney v. Adams*, 2020 WL 7250101, at *4 (Dec. 10, 2020)).  And, a plaintiff must demonstrate that the case is ripe— "not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).[2]  Put another way, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc.*, 549 U.S. at 127.  And it must allow for "'specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

As the Bank points out, the Declaratory Judgment Act serves, in part, "to relieve potential defendants from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure or never." *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981) (quotation omitted).  But the Act can only afford relief to

---

[2] Ripeness can be addressed as the "time dimension" of standing.  *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1242 (9th Cir. 1991) (explaining that standing and ripeness in a declaratory judgment action "depend on the sufficiency of [the declaratory plaintiff's] allegations of threatened or actual injury or direct and immediate impact resulting from the [defendant's conduct]"); *see also MedImmune*, 549 U.S. at 128 n.8.

such prospective defendants "once the adverse positions have crystallized and the

conflict of interests is real and immediate." *Id.* (quotation omitted); *see also Pub.*

*Serv. Comm'n v. Wycoff, Co.*, 344 U.S. 237, 244 (1952) ("The disagreement

[underlying the declaratory relief action] *must not be nebulous or contingent but*

*must have taken on a fixed and final shape* so that a court can see what legal issues

it is deciding, what effect its decision will have on the adversaries, and some useful

purpose to be achieved in deciding them.") (emphasis added).

      The Bank largely relies upon intellectual property cases, which hold

that a "trademark or patent dispute ripen[s] into an actual controversy" when a

declaratory action plaintiff "has a real and reasonable apprehension that he will be

subject [to suit]." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 396

(9th Cir. 1982) (quoting *Societe de Conditionnement en Aluminium*, 655 F.2d at

944); *see also, e.g.*, *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1157 (9th Cir.

2007); *E.&J. Gallo Winery v. Proximo Spirits, Inc.*, 583 F. App'x 632, 634 (9th

Cir. 2014). These cases do not support the Bank's position.

      Declaratory relief is "indisputably appropriate" in patent cases.

*Societe de Conditionnement en Aluminium*, 655 F.2d at 943 (quotation omitted).

As the Ninth Circuit has explained:

> The availability of declaratory relief serves both judicial efficiency
> and the policies underlying the patent laws. Before passage of the
> [Declaratory Judgment Act] . . . [a] patentee could chill competition
> by declaring that his competitors were infringing his patents and by

threatening an infringement suit.  Unless the patentee actually brought an infringement suit, questions of validity of the patent or infringement by competitors could not be adjudicated.  Competitors might have no practical recourse except to enter into a licensing agreement or make some other arrangement with the patentee . . . The Act permits competitors in some instances to eliminate these [invalid and overbroad patents] without waiting to be sued.

*Id.* (citations omitted).

Put another way, because intellectual property disputes arise when the intellectual property rights of two parties overlap or conflict, the adverse legal interests of the parties are clear, as is the precise nature of the claim that a declaratory judgment plaintiff apprehends: they invariably fear being sued for infringing on the intellectual property of the defendant and thus seek a declaration that their claim is superior.  *See Rhoades*, 504 F.3d at 1157 ("An action for a declaratory judgment *that a patent or trademark is invalid, or that the plaintiff is not infringing*, presents a case or controversy if the plaintiff has a real and reasonable apprehension that he will be subject to liability if he continues to manufacture his product.") (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555-56 (9th Cir. 1990)) (brackets omitted).  In short, a declaratory action in the case of intellectual property disputes is almost always justiciable because the dispute is clear and concrete and because a declaration as to which party's claim is superior provides conclusive relief.

At times, courts have applied the "real and reasonable apprehension" rule outside of the intellectual property context.  But these cases are united by a common thread: the threatened legal claims are concretely defined.  *See e.g.*, *Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1092 (9th Cir. 1992) (applying "real and reasonable apprehension" standard where federal government threatened tribe with immediate seizure of a specific type of lotto machine "without court orders" because the machines allegedly violated the Indian Gaming Rights Act); *Elec. Ins. Co. v. Crane*, 692 F. App'x 459, 460 (9th Cir. 2017) (Mem.) (finding a "real and reasonable apprehension" sufficient to allow declaratory claim where the declaratory defendant had already filed a wrongful death action against the declaratory plaintiff); *cf. Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1056 (9th Cir. 2008) (holding that plaintiff who had already filed a fraud suit under the Sherman Act, Lanham Act, and RICO had standing to seek a declaration that the defendant's fraudulently procured contracts were invalid).

The Bank argues that it has a comparable "real and reasonable apprehension" that it will be subject to suit because "[a]fter years of escalating rhetoric and investigation, the Council authorized special counsel to pursue legal claims against the Bank."  ECF No. 33 at PageID # 325.  But, unlike the cases upon which it relies, the Bank's argument is "riddled with contingencies and speculation that impede judicial review."  *Trump*, 2020 WL 7408998, at *2.  The

Bank alleges that the County will bring claims that arise from the Bank's 1994 pledge to loan $150 million to native Hawaiians.  ECF No. 33 at PageID # 337. But this is "no more than conjecture."  *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).  Neither the 2020 nor the 2019 Resolution provides any details as to the nature of the claims the County might consider bringing against the Bank— if it will bring any claims at all.  Instead, the Resolutions suggest that claims may be brought related to "the Bank of America and *other mortgage lenders* failure to fulfill loan commitments, *fraudulent foreclosures, and similar unlawful conduct*," ECF No. 26-2 at PageID # 287 (emphasis added), including "failure[s] to fulfill loan commitments to native Hawaiians, *Filipinos, and others*."  *Id.* at PageID # 286 (emphasis added).  The $150 million dollar commitment is not mentioned in any official County document, except the 2018 Resolution.  ECF No. 33-9 at PageID ## 404-05.  But that Resolution is unrelated to the County's own efforts to pursue litigation.  Instead, it voices the County's support for the *State of Hawaii's efforts* to "intervene between [native Hawaiian community groups] and the Bank of America to reach a settlement agreement relating to a $150 million loan commitment for native Hawaiians on Hawaiian Home Lands, now twenty years overdue."  *Id.* at PageID # 405.  In short, the Bank's prediction that the County will bring a claim related to the $150 million loan pledge is "just that—a prediction." *Trump*, 2020 WL 7408998, at *2.

Moreover, even if the County was considering claims related to the $150 million loan commitment, the relief the bank seeks is still too speculative to present a justiciable case or controversy. The Bank first seeks a declaration that "there was no contract between the [Bank] and the County." ECF No. 1 at PageID # 5. But the assertion that the County will bring a contract claim "involves a significant degree of guesswork." *Trump*, 2020 WL 7408998, at *2. Neither the 2020 Resolution nor any of the prior statements, resolutions, or documents that the Bank points to provides any indication that the County would advance a contract claim. The only party that has ever mentioned a contract, and only in speculation, is the Bank itself. The Bank's conjecture alone does not create a "definite and concrete" contractual dispute. *Societe de Conditionnement en Aluminium*, 655 F.2d at 943.

The Bank's other requests for declaratory relief are equally unavailing. The Bank asks the court to declare that the County does not have standing for its 'claims' related to the $150 million loan commitment; that the 'claims' are barred by the statute of limitations and by the common law doctrine of laches; and that the 'claims' are preempted by federal law. ECF No. 1 at PageID # 5. Each of these requests for relief share the same fundamental flaw: the Bank "simply do[es] not know whether and [what]" claims the County will bring. *Trump*, 2020 WL 7408998, at *2. The court cannot possibly rule on whether the

13

County has standing to assert unknown claims or whether unknown claims can be precluded by the affirmative defenses of laches, statute of limitations, or preemption.[3]  As an example, the court could not possibly rule on whether a statute of limitations had run without knowing the specific causes of action and specific limitations period that apply to that claim.  By asking the court to rule based purely on its own hypothetical speculation, the Bank is seeking an "unconstitutional advisory opinion."  *Rhoades*, 504 F.3d at 1157; *see also MedImmune, Inc.*, 549 U.S. at 127.

Put another way, the harms against which the Bank seeks preemptive relief are not sufficiently imminent to constitute a ripe controversy.  For example, in *Burlington N. R.R. Co.*, the only railroad passing through the Crow Tribe's reservation sought a declaration that a tribal ordinance enacted to regulate its conduct was invalid.  The "[m]ere passage" of a tribal ordinance "with a potential for enforcement" against the railroad was "not sufficient to make the controversy

---

[3] The cases that the Bank relies upon for the position that the Declaratory Judgment Act allows courts to rule on affirmative defenses are clearly distinguishable.  In those cases, the declaratory defendants had already threatened or advanced specific claims, thereby enabling the courts to tether their consideration of affirmative defenses to the substance of those claims.  *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 502 (1959) (allowing consideration of affirmative defenses where declaratory plaintiff sought declaration that it was not in violation of anti-trust acts and declaratory defendant counter-sued bringing anti-trust claims); *Pixels.com, LLC v. Instagram, LLC*, 2015 WL 10943591, at *2 (N.D. Cal. Dec. 21, 2015) (allowing consideration of affirmative defenses in an action for declaratory relief where the plaintiff sought a declaration that it had not infringed on the trademark of the defendant).  Further, the Supreme Court has indicated that the Declaratory Judgment Act is not to be used "to gain a litigation advantage by obtaining an advance ruling on an affirmative defense."  *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998).

ripe."  940 F.2d at 1243.  But because the Tribe had taken the additional steps of

creating a commission to enforce the ordinance and sending a letter to the railroad

citing the resolution and "requesting a meeting with [railroad] representatives

concerning complaints of non-compliance," the controversy was sufficiently ripe

to be justiciable.  *Id.*; *see also Native Vill. of Tanana v. Cowper*, 945 F.2d 409,

1991 WL 190113, at *3 (9th Cir. 1991) ("A threat of enforcement of a general

nature is insufficient to meet the case or controversy requirements of Article III of

the Constitution and the 'actual controversy' requirement of the Declaratory

Judgement Act."); *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1079 (9th Cir.

2010) (finding dispute over whether tribe had authority to prevent residential

zoning on parcel of land not ripe where municipality had not authorized such

development in its zoning code and had no current plans to sell the parcel to a

developer or to construct a housing development there).

Here, the County has enacted a resolution authorizing employment of

special counsel to represent the County in the initiation and pursuit of legal claims

against mortgage lenders, including the Bank of America.  But the County has

taken no further steps toward litigation.  Without more, the "contingent nature" of

the Bank's preemptive declaratory judgment action precludes justiciability.

*Trump*, 2020 WL 7408998, at *3.

**B.     Exercise of Discretion**

Even assuming that this matter presented a justiciable case or controversy, the court would exercise its discretion to decline to entertain the action.  District courts exercise "unique and substantial discretion" to decline to issue a declaratory judgment.  *Wilton*, 515 U.S. at 286-87 ("The statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface.  We have repeatedly characterized the Declaratory Judgment Act as an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.") (quotation and citations omitted); *see also Burlington Ins. Co. v. Panacorp, Inc.*, 758 F. Supp. 2d 1121, 1139 (D. Haw. 2010).

In *Brillhart v. Excess Insurance Co. of America*, 316 U.S. 491 (1942), the Supreme Court set forth a non-exhaustive list of factors (the "*Brillhart* factors") that serve as the "philosophic touchstone" for district courts determining whether to entertain declaratory judgment actions.  *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 & n.5 (9th Cir. 1998) (en banc).  Under *Brillhart*, the court should (1) avoid needless determination of state law issues; (2) discourage litigants from filing declaratory actions as a means of forum shopping; and (3) avoid duplicative litigation.  *Id.* at 1225.  In *Dizol*, 133 F.3d at 1225 n.5, the Ninth Circuit

introduced additional factors (the "*Dizol* factors"): (4) whether the declaratory action will settle all aspects of the controversy; (5) whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; (6) whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a "res judicata" advantage; and (7) whether the use of a declaratory action will result in entanglement between the federal and state court systems.  In short, the district court must "balance concerns of judicial administration, comity, and fairness to the litigants."  *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005) (quoting *Kearns*, 15 F.3d at 144).

   Here, the same defects that render this case non-justiciable support the court's decision to decline to issue a declaratory judgment.  First, because the nature of the claims that the County might bring against the Bank—if indeed it proceeds with any claims at all—remain unknown, the court would almost certainly be required to decide unnecessary state law issues if the declaratory action was to proceed.  For example, the Bank asks for a declaration that there is no contract between itself in the County.  But because the County's Resolutions provide no indicia that the County intends to bring a contract claim, deciding this question of state law may prove entirely superfluous.  Likewise, the Bank asks the court to determine that the County's 'claims' are barred by the statute of limitations.  But, again, because the claims are unknown, this would require the

17

court to assess all potentially applicable Hawaii statutes of limitations, many of which would likely prove inapplicable to whatever range of claims the County ultimately decides to bring.[4]

Avoiding needless determination of state law questions "alone" may support declining jurisdiction. *R.R. Street & Co. Inc. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011) (citing *Huth v. Hartford Ins. Co.*, 298 F.3d 800, 802-04 (9th Cir. 2002). Nevertheless, the court considers the remaining factors. The second *Brillhart* factor, that courts should discourage forum shopping, weighs slightly in favor of declining jurisdiction. A party is typically understood to be forum shopping where the action is "reactive" or "defensive" in that a "federal plaintiff seeks declaratory relief in anticipation that a related state court proceeding may be filed." *Panacorp, Inc.*, 758 F. Supp. 2d at 1143. Here, the suit appears reactive, the Bank having filed mere hours after the County Council enacted the 2020 Resolution.[5]

---

[4] During the December 14, 2020 hearing, the Bank conceded as much and was unable to name each applicable statute of limitations the court would be required to analyze.

[5] The Bank argues that it is not forum shopping because there would be complete diversity if the County filed a suit against it, meaning that the Bank would have a right to remove to federal court. *See Nautilus Ins. Co. v. RMB Enters., Inc.*, 2020 WL 6324312, at *9 (D. Haw. Oct. 28, 2020) (analyzing the "forum shopping" *Brillhart* factor and holding that "[b]ecause diversity jurisdiction provides a basis to bring suit in federal court, Plaintiff did not engage in forum shopping") (citing *First State Ins. Co. v. Callan Assocs., Inc.*, 113 F.3d 161, 162 (9th Cir. 1997)). On the other hand, if the County filed suit against the Bank and other mortgage lenders based in Hawaii (e.g., Bank of Hawaii), then the Bank may or may not be able to remove the case to federal court. At this premature stage, there is simply no way of knowing what parties the County might sue.

18

Turning to the last *Brillhart* factor, entertaining this premature declaratory action would not achieve the goal of avoiding "duplicative litigation." Typically, when courts analyze this factor there is an underlying or parallel state law action, or such an action is imminent.  *See, e.g.*, *Dizol*, 133 F.3d at 1225; *R.R. Street & Co.*, 656 F.3d at 976-77.  Here, analysis under this factor is a poor fit because the claims that the County might bring remain unknown.  But, as discussed above, because the questions the Bank asks the court to decide may ultimately prove irrelevant to resolving the underlying dispute, by declining to entertain the action, the court will certainly avoid *unnecessary* litigation.  And dispensing with such superfluous litigation accords with the animating principle of the "duplicative litigation" factor, which is to conserve judicial resources.  *See State Farm Fire & Cas. Co. v. Wilson*, 833 F. Supp. 2d 1200, 1215 (D. Haw. 2011) (explaining that "[c]onservation of judicial resources is the underlying principle behind this factor.") (citing *Brillhart*, 316 U.S. at 495).

The *Dizol* factors also favor declining jurisdiction.  First, a declaratory action at this stage will neither "settle all aspects of the controversy" nor "serve a useful purpose in clarifying the legal relations at issue" because—again—the precise nature of the controversy is unknown, as are the specific legal relations at

issue.  An exercise in hypotheticals would not clarify let alone definitively settle the controversy.  It would only waste the court's time and resources.[6]

Finally, the court declines to exercise jurisdiction because this declaratory action appears to be an attempt at "procedural fencing."  This *Dizol* factor is meant to deter litigants from filing declaratory actions as a form of "defensive maneuvering" or for "strategic purposes."  *R.R. Street & Co.*, 656 F.3d at 976.  Engaging in this kind of litigation tactic warrants dismissal.  *Id.*; *cf. Continental Cas. Co. v. Robsac Indus.*, 947 F.2d 1367, 1371 (9th Cir. 1991) (declining to exercise jurisdiction under the "forum shopping" *Brillhart* factor where the declaratory plaintiff corporation "filed in federal court because [it] apparently perceived a tactical advantage from litigating in a federal forum"), *overruled in part on other grounds by Dizol*, 133 F.3d at 1227.  Here, the Bank appears to have filed this lawsuit to achieve a tactical advantage.  The Bank brought suit just hours after the County passed the 2020 Resolution authorizing employment of special counsel, without any concrete knowledge of the claims—if any—that the County would bring.  It is reasonable to infer that this was done to place the County in a defensive position before the County's threat of future litigation could take on a concrete form.

---

[6] For the same reasons, the court is unable to determine whether hearing this action would result in entanglement of federal and state court proceedings.  Thus, this factor is at best neutral.

## V. **CONCLUSION**

The Bank's declaratory action does not present a justiciable case or controversy, and, even if it did, the court would exercise its discretion to decline to issue a declaratory judgment.  The County's Motion to Dismiss is GRANTED with prejudice.  The Clerk of Court shall close the case file.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 28, 2020.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Bank of America, N.A. v. County of Maui*, Civ. No. 20-00310 JMS-WRP, Order Granting Defendant's Motion to Dismiss Complaint, ECF No. 26.